IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| TELA BIO, INC., *et al.*, | : | CIVIL ACTION |
| Plaintiffs, | : | |
| v. | : | No. 16–5585 |
| FEDERAL INSURANCE COMPANY, | : | |
| Defendant. | : | |

Goldberg, J.                                                                                           March 15, 2018

## MEMORANDUM OPINION

This insurance coverage case stems from a New Jersey state court lawsuit wherein it was alleged that a company and two of its individual co-founders stole a competitor's employees and trade secrets, in an effort to develop and sell competing products. In the case before me, Plaintiffs—TELA Bio, Inc. ("TELA Bio") and its individual co-founders, Anthony Koblish and Maarten Persenaire—seek a judicial declaration that Defendant, Federal Insurance Company ("Federal Insurance"), had a duty to defend them in the underlying state suit, under an insurance policy that Federal Insurance issued to TELA Bio.

Pending are Federal Insurance's Motion to Dismiss for Failure to State a Claim, and TELA Bio's Motion for Partial Summary Judgment. For the reasons that follow, Federal Insurance's Motion will be granted. Accordingly, I need not reach TELA Bio's Motion, which will be denied as moot.

1

## I. FACTUAL & PROCEDURAL BACKGROUND

Unless otherwise noted, the following facts are derived from TELA Bio's Complaint and the exhibits attached thereto, which include the complaint in the underlying state suit and the insurance policy at issue.

### A. *The Underlying Lawsuit*

The plaintiff in the underlying state suit, LifeCell Corporation ("LifeCell"), is a "regenerative medicine company." Founded in 1986, LifeCell develops and sells "tissue repair and replacement products" used in reconstructive surgeries such as breast reconstruction and hernia repair. (Compl., Ex. 2 (cited hereinafter as "LifeCell Suit Compl.") ¶¶ 1, 18.)

In 2012, LifeCell's former director of research and development, David McQuillan, co-founded a new company, TELA Bio, allegedly to develop a hernia repair product to compete with LifeCell.[1] To develop and market its competing product, TELA Bio allegedly recruited and hired more than 20 LifeCell employees, knowing that those employees were prohibited from working for TELA Bio due to non-competition covenants. Several of these employees allegedly provided TELA Bio with trade secrets and other proprietary information regarding both the design of LifeCell's products and LifeCell's strategies to market those products. (LifeCell Suit Compl. ¶¶ 2-4, 214-247, 251.)

In March 2015, LifeCell filed suit in New Jersey state court. (This suit is referred to hereinafter as the "LifeCell Suit.") Named as defendants in the LifeCell Suit were TELA Bio and two individuals who, along with McQuillan, co-founded TELA Bio—Anthony Koblish and Maarten Persenaire. (The defendants in the LifeCell Suit, all of which are Plaintiffs in this action, are referred to hereinafter collectively as "TELA Bio.") The LifeCell Suit Complaint set out six

---

[1] According to the complaint in the underlying state suit, McQuillan co-founded TELA Bio surreptitiously, and in violation of non-competition, confidentiality, and other covenants. (LifeCell Suit Compl. ¶¶ 3-5.)

causes of action against TELA Bio: (1) misappropriation of trade secrets in violation of the New Jersey Trade Secrets Act; (2) misappropriation of proprietary information under New Jersey common law; (3) unfair competition under the New Jersey Unfair Competition Act and New Jersey common law; (4) tortious interference with contract and prospective economic advantage; (5) civil conspiracy; and (6) unjust enrichment. (Compl. ¶ 10; LifeCell Suit Compl. ¶¶ 214-229.)

### B. *The Insurance Policy Federal Insurance Issued to TELA Bio*

The insurance policy at issue is a commercial general liability policy issued by Federal Insurance to TELA Bio on February 5, 2013 (hereinafter "the Policy"). While the Policy contains numerous coverage provisions, TELA Bio seeks coverage for the LifeCell Suit under only one of these provisions, entitled "Advertising Injury and Personal Injury Liability Coverage." This provision, in relevant part, covers "damages and **claimant costs** that the **insured** becomes legally obligated to pay . . . for . . . **personal injury** that is caused by an offense to which this coverage applies."[2] The Policy, in turn, sets out five "offense[s]" to which this coverage applies, only one of which is applicable here: "electronic, oral, written or other publication of material that . . . libels or slanders a person or organization (which does not include disparagement of goods, products, property, or services)." (This provision is referred to hereinafter as the "Libel and Slander Provision.") The terms "publication," "libel," and "slander" are not defined in the Policy. (Compl. ¶ 8; Compl., Ex. 1 (cited hereinafter as "Policy"), Doc. No. 1-3 at 73, Doc. No. 1-4 at 23.)

The Policy also contains a number of exclusionary provisions, including one that is relevant here, entitled "Intellectual Property Laws or Rights." (This exclusionary provision is referred to hereinafter as the "IP Rights Exclusion"). The IP Rights Exclusion provides, in relevant part:

---

[2] The bolding is in the original text of the Policy and signifies terms that are defined therein.

A. This insurance does not apply to any damages, loss, cost or expense arising out of, giving rise to or in any way related to any actual, alleged or threated:

   a. Assertion; or

   b. Infringement or violation

   by any person or organization (including any **insured**) of any **intellectual property law or right**.

B. Further, this insurance does not apply to the entirety of all allegations in any claim or **suit**, if such claim or **suit** includes an allegation of or a reference to an infringement or violation of an **intellectual property law or right**, even if the insurance would otherwise apply to any part of the allegations in the claim or suit.

The Policy defines "intellectual property law or right" as, in relevant part, "any . . . right to, or judicial or statutory law recognizing an interest in, any trade secret or confidential or proprietary non-personal information." (Policy, Doc. No. 1-3 at 96, Doc. No. 1-4 at 18.)

### C. *The Declaratory Judgment Action*

In late January 2016—approximately ten months after the LifeCell Suit was filed in New Jersey state court—TELA Bio notified Federal Insurance of the LifeCell Suit, requesting a defense under the Policy. Believing that Federal Insurance would refuse to defend it, TELA Bio shortly thereafter brought this declaratory judgment action in the United States District Court for the District of New Jersey, seeking a declaration that the LifeCell Suit is covered by the Policy's Libel and Slander Provision.[3] (Compl. ¶¶ 12-13.)

Federal Insurance moved to transfer venue to this Court, and the Honorable Freda L. Wolfson granted that motion in an Opinion dated October 25, 2016. Following transfer of venue to this Court, the parties filed the motions presently before me. (10/25/2016 Op., Doc. No. 1-41.)

---

[3] Within two weeks of the filing of this action, Federal Insurance did, in fact, disclaim coverage for and refuse to defend the LifeCell Suit. (See Decl. of Francis M. Conway in Supp. of TELA Bio's Mot. for Partial Summ. J., Ex. F, Doc. No. 21-10.)

In its Motion to Dismiss, Federal Insurance contends that TELA Bio has failed to state a claim for two reasons. First, Federal Insurance maintains that it had no duty to defend the LifeCell Suit because none of the factual allegations in the LifeCell Suit Complaint triggered coverage under the Policy's Libel and Slander Provision. Second, Federal Insurance contends that, even if the allegations in the LifeCell Suit Complaint triggered coverage under the Policy's Libel and Slander Provision, the Policy's IP Rights Exclusion precludes coverage for the entire suit such that Federal Insurance had no duty to defend.

For the reasons that follow, I conclude that Federal Insurance is correct on both points, and will therefore dismiss this action with prejudice for failure to state a claim.

## II.    **LEGAL STANDARD**

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The plausibility standard requires more than a "sheer possibility that a defendant has acted unlawfully." Id. While it "does not impose a probability requirement at the pleading stage," plausibility does require "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements of a claim." Phillips v. Cty. of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008).

To determine the sufficiency of a complaint under Twombly and Iqbal, a court must take the following three steps: (1) the court must "tak[e] note of the elements a plaintiff must plead to state a claim;" (2) the court should identify the allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth;" and (3) "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they

plausibly give rise to an entitlement for relief." Burtch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011) (citations omitted). Courts must construe the allegations in a complaint "in the light most favorable to the plaintiff." Id. at 220.

In evaluating a motion to dismiss, courts generally consider only the allegations contained in the complaint, the exhibits attached thereto, and matters of public record. Schmidt v. Skolas, 770 F.3d 241, 249 (3d Cir. 2014); Pryor v. Nat'l Collegiate Athletic Ass'n., 288 F.3d 548, 567 (3d Cir. 2002). "[A] complaint may not be dismissed merely because it appears unlikely that [a] plaintiff can prove those facts or will ultimately prevail on the merits." Connelly v. Lane Const. Corp., 809 F.3d 780, 790-91 (3d Cir. 2016) (quoting Phillips, 515 F.3d at 231).

### III. ANALYSIS

#### A. *Choice of Law*

The parties first dispute which state's law applies—Pennsylvania's or New Jersey's. TELA Bio maintains that New Jersey law applies, noting that both Federal Insurance and LifeCell have their principal place of business in New Jersey, and that the LifeCell Suit was filed in New Jersey state court and involved New Jersey state law claims. Federal Insurance contends that Pennsylvania law applies, noting that while its principal place of business is in New Jersey, the Policy was issued in Pennsylvania by a Pennsylvania broker, and that the insureds—TELA Bio as well as the individual insureds, Koblish and Persenaire—are Pennsylvania residents.

A federal court in Pennsylvania exercising diversity jurisdiction generally must apply Pennsylvania choice of law rules to decide which state's law applies. See Klaxon Co. v. Stentorlec. Mfg. Co., 313 U.S. 487 (1941). However, where, as here, venue has been transferred from one district court to another, the applicable choice of law rules are those of the state from which the case was transferred. Lafferty v. St. Riel, 495 F.3d 72, 76-77 (3d Cir. 2007). Thus,

because this case was transferred from the District of New Jersey, I will apply New Jersey's choice of law rules to determine which state's law applies.

New Jersey choice of law rules set out a two-step process for determining which state's law applies. "[T]he first step is to determine whether an actual conflict exists," which "is done by examining the substance of the potentially applicable laws to determine whether there is a distinction between them." P.V. ex rel T.V. v. Camp Jaycee, 962 A.2d 453, 460 (N.J. 2008) (internal quotation marks omitted). "If there is not a conflict, the inquiry is over and, because New Jersey would apply its own law in such a case, a federal court sitting in diversity must do the same." Lebegern v. Forman, 471 F.3d 424, 428 (3d Cir. 2006) (apply New Jersey choice of law rules).

Pennsylvania and New Jersey law do not conflict as to the general scope of an insurer's duty to defend. Compare Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co. ("Kvaerner"), 908 A.2d 888, 896-897 (Pa. 2006) (explaining that, under Pennsylvania law, a court determining whether an insurer has a duty to defend should "look to the language of the [insurance] polic[y] . . . to determine in which instances [it] will provide coverage, and then "examine [the underlying] complaint to determine whether the allegations set forth therein constitute the type of instances that will trigger coverage"), with Abouzaid v. Mansard Gardens Assocs., LLC, 23 A.3d 338, 346 (N.J. 2011) (explaining that, under New Jersey law, "the determination of an insurer's duty to defend requires review of the [underlying] complaint with liberality to ascertain whether the insurer will be obligated to indemnify the insured if the allegations are sustained").

7

However, New Jersey and Pennsylvania law diverge as to whether a court may, in determining whether there is a duty to defend, look beyond the facts alleged in the underlying complaint. Pennsylvania law precludes a court from considering facts outside of the underlying complaint. See Kvaerner, 908 A.2d at 896 ("[W]ell-established precedent . . . require[es] that an insurer's duty to defend . . . be determined solely from the language of the complaint against the insured"); Scopel v. Donegal Mut. Ins. Co., 698 A.2d 602, 607 (Pa. Super. Ct. 1997) (rejecting "argument that, in considering whether an insurer's duty to defend a policyholder has been triggered, consideration may be given to factual averments contained in discovery evidence [in the underlying case] but not reflected in the [underlying] complaint itself"). By contrast, New Jersey law provides that facts outside of the underlying complaint may trigger the duty to defend. See Abouzaid, 23 A.3d at 347 (noting that while "courts generally look to the [underlying] complaint to ascertain the duty to defend, the analysis is not necessarily limited to the facts asserted in the [underlying] complaint," as the duty to defend "may also be triggered by facts indicating potential coverage that arise during the resolution of the underlying dispute").

The conflict between Pennsylvania and New Jersey law matters in this case: TELA Bio, urging me to apply New Jersey law, contends that I may look beyond the allegations contained in the LifeCell Suit Complaint, to facts revealed in discovery in the LifeCell Suit; Federal Insurance, contending that Pennsylvania law applies, responds that I may not do so.

Because there is an actual conflict between New Jersey and Pennsylvania law as to the duty to defend, I proceed to the second step of the conflict of laws analysis in order to determine which state's law governs. This step requires a court to "assess the interests each state has in applying its own law and determine which state has the most significant relationship to the parties and the event." Lebegern, 471 F.3d at 428. In considering this question with regard to an

8

insurance policy, a court should first look to "the place that the parties understood . . . to be the principal location of the insured risk," and should apply the law of that state "unless some other state has a more significant relationship . . . to the transaction and the parties." Pfizer, Inc. v. Emp'rs Ins. of Wausau, 712 A.2d 634, 638 (N.J. 1998) (internal quotation marks omitted).

Here, the principal location of the risk insured by the Policy appears to be Pennsylvania. The Policy is a general commercial liability policy insuring TELA Bio—a business with its principal place of business located in Pennsylvania. (Compl. ¶ 1.) And TELA Bio does not point to anything in its Complaint, in the LifeCell Suit Complaint, or in the Policy itself that suggests that a larger portion of the risk insured by the Policy was situated in New Jersey or any other state. TELA Bio does not contend, for example, that it maintained offices in any other state or disclosed to Federal Insurance that substantial risks were located in any other state. See, e.g., Borden-Pelman Ins. Agency, Inc. v. Utica Mut. Ins. Co., No. A-1313-14T3, 2016 WL 1368589, at *5-7 (N.J. Super. Ct. App. Div. Apr. 7, 2016) (applying law of Texas, where underlying suit was located, rather than the principal location of the insured, and noting that "it was no surprise to [the insurer] . . . that [the insured] was a multi-state operation with employees in Texas" and that "the policy . . . cover[ed] disclosed risks in . . . Texas).

Moreover, New Jersey does not have a more significant relationship to the transaction and the parties than the primary place of the insured risk, Pennsylvania. In determining which state bears the most significant relationship, New Jersey choice of law rules require courts to consider four factors: (1) "the competing interests of the relevant states," which "require courts to consider whether application of a competing state's law . . . will advance the policies that the law was intended to promote;" (2) "the national interests of commerce among the several states," which "require courts to consider whether application of a competing state's law would frustrate

the policies of other states," (3) "the interests of the parties," which "require courts to focus on [the parties'] justified expectations," and (4) "the interests of judicial administration," which "require a court to consider whether the fair, just, and timely disposition of controversies . . . will be fostered by the competing law chosen." Lonza, Inc. v. Hartford Acc. & Indem. Co., 820 A.2d 53, 62 (N.J. Super Ct. App. Div. 2003) (internal quotation marks omitted) (quoting Pfizer, 712 A.2d at 639).

These factors support the application of Pennsylvania law. Regarding the first factor, New Jersey does not have a significant interest in having its law applied to this case, as the insureds—whose interests insurance law is generally intended to protect—are not New Jersey residents.[4] As to the second factor, the application of Pennsylvania law would not frustrate New Jersey's policies for the same reason: the insureds are not New Jersey residents. As to the third factor, the parties would justifiably expect Pennsylvania law to apply, given that the Policy was issued to Pennsylvania insureds through a Pennsylvania broker (See Policy, Doc. No. 1-1 at 22 (listing a Philadelphia address for the broker of the Policy, Aon Risk Services Central, Inc.)) And as to the fourth factor, the application of New Jersey law would not foster a more fair, just, and timely disposition of this matter: As Federal Insurance notes, Pennsylvania law simplifies the necessary analysis as to the duty to defend by limiting the facts to be considered to those alleged in the underlying complaint.

---

[4] Indeed, Judge Wolfson, in ordering venue transferred from the District of New Jersey to this Court, rejected TELA Bio's argument that "New Jersey has a local interest in deciding" this declaratory judgment action, "especially since LifeCell alleges that T[ELA] Bio caused direct harm to a New Jersey corporation and residents." (10/25/2016 Op. 10.) In rejecting this argument, Judge Wolfson noted that this action "is not a lawsuit between T[ELA] Bio and LifeCell," but between TELA Bio and Federal Insurance to establish who must pay the costs of TELA Bio's defense, a controversy in which New Jersey has no interest. (Id.) While Judge Wolfson's decision regarded venue, not choice of law, her conclusion as to New Jersey's interest in this matter is no less instructive here.

In sum, because Pennsylvania appears to be the principal location of the risk insured by the Policy, and because New Jersey does not bear a more significant relationship to the parties or this matter, I will apply Pennsylvania law in assessing whether Federal Insurance had a duty to defend TELA Bio in the LifeCell Suit.

## B. *The Duty to Defend Under Pennsylvania Law*

Under Pennsylvania law, an insurer has a duty to defend a lawsuit against its insured where the complaint in that underlying lawsuit "avers facts that would support a recovery covered by the policy." Gen. Acc. Ins. Co. of Am. v. Allen, 692 A.2d 1089, 1095 (Pa. 1997). Thus, "[t]he duty to defend is triggered where the underlying complaint makes at least one allegation that falls within the scope of the policy's coverage." Bealer v. Nationwide Mut. Ins. Co., No. 16-cv-3181, 2016 WL 6833014, at *3 (E.D. Pa. Nov. 16, 2016) (applying Pennsylvania law). "[T]he particular cause of action that [the underlying] complaint pleads is not determinative of whether coverage has been triggered." Mut. Benefit Ins. Co. v. Haver, 725 A.2d 743, 745 (Pa. 1999). Rather, a court looks to the factual allegations in the underlying complaint, which the court must "liberally construe[] in favor of the insured." Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co., 193 F.3d 742, 746 (3d Cir. 1999) (applying Pennsylvania law).

As noted in the choice of law discussion above, Pennsylvania law adheres to its "long-standing rule that an insurer's duty to defend is triggered, if at all, by the factual averments contained in the complaint [in the underlying lawsuit] itself." Kvaerner, 908 A.2d at 896-97. Accordingly, I will not consider, as TELA Bio urges me to do, facts outside of the LifeCell Suit Complaint.

In determining whether the facts alleged in an underlying complaint trigger coverage under an insurance policy, it is necessary to interpret that policy to ascertain the scope of coverage. "[T]he interpretation of the scope of coverage of an insurance contract is a question of

11

law properly decided by the court." Med. Protective Co. v. Watkins, 198 F.3d 100, 103 (3d Cir. 1999) (applying Pennsylvania law).

### C. *Coverage Under the Libel and Slander Provision*

With these principles in mind, I turn to whether any of the allegations in the LifeCell Suit Complaint trigger coverage under the Policy's Libel and Slander Provision. As noted above, this provision provides coverage for damages caused by the insured's "electronic, oral, written or other publication of material that . . . libels or slanders a person or organization (which does not include disparagement of goods, products, property, or services)."

Because the Policy does not define "libel" or "slander," I will interpret these terms in accordance with their natural, plain, and ordinary meaning. See Ramara, Inc. v. Westfield Ins. Co., 814 F.3d 660, 666-667 (3d Cir. 2016) (applying Pennsylvania law in interpreting an insurance policy and noting that "[a] court construes commonly used words and phrases in their natural, plain, and ordinary sense" (internal quotation marks omitted)). In their ordinary sense, the terms "libel" and "slander" refer to one's defaming of another, differing only in whether such defamation was done by writing or speech. Compare Black's Law Dictionary 999 (9th ed. 2009) (defining "libel" as "a defamatory statement expressed in a fixed medium, esp. writing"), with id. at 1514 (defining "slander" as "a defamatory assertion expressed in a transitory form, esp. speech"). In turn, a statement is "defamatory" if it "tend[s] to harm a person's reputation." Id. at 480 (defining "defamatory").

Federal Insurance contends that there is no coverage for the LifeCell Suit under the Libel and Slander Provision because the LifeCell Suit Complaint does not allege that TELA Bio made any statements that libeled or slandered LifeCell. TELA Bio responds that it can be inferred from

12

certain allegations in the LifeCell Suit Complaint that TELA Bio made defamatory statements about LifeCell to LifeCell's employees and potential customers.

These allegations are of generally three varieties: (1) allegations that TELA Bio described its own product as the "next generation" of one of LifeCell's products; (2) allegations that TELA Bio "exploited" or "used" LifeCell's "reputation" and "goodwill" to LifeCell's detriment; and (3) allegations that TELA Bio induced LifeCell's employees to leave LifeCell and join TELA Bio by telling them that it had a "strategy" to avoid violating their non-competition covenants. As discussed in greater detail below, even reading these allegations liberally, as I must, none of them support an inference that TELA Bio made defamatory statements about LifeCell, such that coverage was triggered under the Policy's Libel and Slander Provision.

First, TELA Bio points to an allegation in the LifeCell Suit Complaint that a TELA Bio representative described its own product as the "next generation" of one of LifeCell's hernia repair products, "Strattice." (See LifeCell Suit Compl. ¶ 256 ("[A] T[ELA] Bio representative has described T[ELA] Bio's product as 'next generation Strattice.'") This statement, TELA Bio contends, "is a defamatory publication," because it "impugn[s] LifeCell's purported status as a state of the art participant in the hernia repair marketplace in which both companies compete" and because it "necessarily claim[s] that LifeCell is not state of the art." (TELA Bio's Br. in Resp. to Federal Insurance's Mot. to Dismiss, Doc. No. 24 (cited hereinafter as "TELA Bio's Resp.), 14.) I do not find "defamation" to be a reasonable inference from this alleged statement, which is no more than a typical marketing phrase about TELA Bio's own product. If anything, the statement affirms the quality of LifeCell's "Strattice" product by suggesting that TELA Bio has developed an enhanced version of it. But the statement does not suggest that LifeCell has not

13

(or could not) itself develop a "state of the art" product, and it certainly does not implicate questions of harm to LifeCell's reputation.

Second, TELA Bio points to several allegations in the LifeCell Suit Complaint that TELA Bio "exploited" or "used" LifeCell's reputation to its own benefit and to LifeCell's detriment. Specifically, TELA Bio references the following allegations in the LifeCell Suit Complaint:

- "T[ELA] Bio's scheme allows T[ELA] Bio to compete *unfairly* with LifeCell for hernia repair business because . . . [m]ost, if not all, of T[ELA] Bio's sales force consists of former LifeCell representatives that can use their former affiliation with LifeCell—and the reputation and goodwill associated with LifeCell's name and brand—to LifeCell's detriment." (LifeCell Suit Compl. ¶ 253.)

- "T[ELA] Bio's mass poaching and recruitment of LifeCell's former employees is unlawful appropriation of LifeCell's reputation and goodwill . . . ." (LifeCell Suit Compl. ¶ 254.)

- "[A]t least one customer that was approached by T[ELA] Bio had the impression that T[ELA] Bio was simply using the credibility of LifeCell employees to sell its product quickly." (LifeCell Suit Compl. ¶ 255.)

- "LifeCell is reasonably apprehensive that T[ELA] Bio will market its product as 'developed by LifeCell scientists' and 'sold by your trusted LifeCell reps.' That strategy exploits LifeCell's reputation and goodwill." (LifeCell Suit Compl. ¶ 257.)

TELA Bio contends that these allegations "evidence[] defamation" because they suggest that TELA Bio "question[ed] LifeCell's capacity to perform, emphasizing its loss of employees to TELA Bio" and "asserted that it possessed superior intellectual property rights." (TELA Bio's Resp. 3-4.) I disagree that these allegations create a reasonable inference that TELA Bio defamed LifeCell. Quite the opposite of suggesting that TELA Bio defamed LifeCell by saddling it (LifeCell) with a *bad* reputation, these allegations accuse TELA Bio of seeking to trade on LifeCell's *good* reputation in order to market its own competing product. And again, coverage is

14

only provided for damages caused by publication of material that "libels or slanders a person or organization."

Third, TELA Bio highlights allegations in the LifeCell Complaint that TELA Bio induced LifeCell employees to leave LifeCell and join TELA Bio by telling them that it had a "strategy" to avoid violating their non-competition covenants. Specifically, the LifeCell Suit Complaint contains the following allegations:

- "T[ELA] Bio's scheme violates 'fair play' because . . . T[ELA] Bio designed a misleading 'strategy' to induce LifeCell sales representatives to leave LifeCell and breach reasonable non-competition covenants." (LifeCell Suit Compl. ¶ 252)

- "T[ELA] Bio has improperly interfered with . . . [LifeCell's] economic relationships [with its stolen employees] because . . . T[ELA] Bio induced those employees to leave LifeCell by misleading those employees into believing that T[ELA] Bio had a 'strategy' that allowed them to violate their legal obligations to LifeCell." (LifeCell Suit Comp. ¶ 267)

TELA Bio contends that, from these allegations, it may be inferred that TELA Bio made "statements about LifeCell's inability to enforce non-competition agreements" and that such statements are defamatory. (TELA Bio's Resp. 13.) While it may be reasonable to infer that TELA Bio made statements to LifeCell employees about having a "strategy" to employ them without violating those employees' non-competition covenants, such statements are not defamatory, because they do not impugn LifeCell's reputation. In arguing to the contrary, TELA Bio cites a case holding that a false allegation that a person "commit[ed] illegal patent infringement" was defamatory. (See TELA Bio's Resp. 13 & n.62 (citing OMI Holdings, Inc. v. Chubb Ins. Co. of Can., No. 95-cv-2519, 1997 WL 30861, at *7 (D. Kan. Jan. 7, 1997) (explaining that a "wrongful accusation of an illegal act is an attack on one's good name or reputation.")) But unlike a false accusation of illegal patent infringement, TELA Bio's alleged statement that it had a "strategy" to avoid violating LifeCell employees' non-competition covenants does not accuse LifeCell of committing an illegal act.

In sum, read either separately or as a whole, the allegations in the underlying suit relied upon by TELA Bio have nothing to do with harm to another's reputation. Rather, the allegations pertain to a business dispute over stolen employees and confidential trade secrets. Because the LifeCell Complaint does not allege that TELA Bio made any statements that can reasonably be considered defamatory, coverage under the Libel and Slander Provision of the Policy was not triggered, and Federal Insurance did not have a duty to defend the LifeCell Suit.

### D. *Applicability of the IP Rights Exclusion*

The lack of coverage for the LifeCell Suit under the Policy's Libel and Slander Provision suffices to establish that Federal Insurance had no duty to defend and that, therefore, TELA Bio's Complaint fails to state a claim. However, I hold alternatively that, even if the allegations in the LifeCell Suit Complaint triggered coverage under the Libel and Slander Provision, Federal Insurance would still have no duty to defend, because the LifeCell Suit falls within the Policy's IP Rights Exclusion. See Britamco Underwriters, Inc. v. Emerald Abstract Co., Inc., 855 F. Supp. 793, 798 (E.D. Pa. 1994) (explaining that "courts [applying Pennsylvania law] have consistently denied coverage where the allegations of the underlying complaint[] clearly fall within policy exclusions").

Once again, the Policy's IP Rights Exclusion reads, in relevant part, as follows:

A. This insurance does not apply to any damages, loss, cost or expense arising out of, giving rise to or in any way related to any actual, alleged or threated:

   a. Assertion; or

   b. Infringement or violation

   by any person or organization (including any **insured**) of any **intellectual property law or right**.

B. Further, this insurance does not apply to the entirety of all allegations in any claim or **suit**, if such claim or **suit** includes an allegation of or a reference to an infringement

16

or violation of an **intellectual property law or right**, even if the insurance would otherwise apply to any part of the allegations in the claim or suit.

And the Policy defines "intellectual property law or right" as, in relevant part, "any . . . right to, or judicial or statutory law recognizing an interest in, any trade secret or confidential or proprietary non-personal information."

Pointing to Paragraph B of the IP Rights Exclusion, Federal Insurance contends that *all* of the allegations in the LifeCell Suit Complaint are excluded from coverage, because the LifeCell Suit Complaint contains allegations that TELA Bio appropriated LifeCell's intellectual property rights in its trade secrets and proprietary information. TELA Bio responds that the IP Rights Exclusion excludes only claims arising out of violations of intellectual property rights, and that the allegations of defamation inferable from the LifeCell Suit Complaint are not excluded. For the reasons set out below, Federal Insurance is correct.

While Paragraph A of the IP Rights Exclusion excludes only losses "related to" a violation or assertion of intellectual property rights, Paragraph B is much broader. Paragraph B excludes from coverage "the *entirety of all allegations* in any . . . suit" in which there is an allegation of a violation of intellectual property rights, "even if the insurance would otherwise apply to any part of the allegations in the . . . suit." While perhaps harsh in its application, it cannot be seriously disputed that Paragraph B of the IP Rights Exclusion clearly and unambiguously excludes from coverage *all* allegations within a suit, if that suit contains *any* allegations of intellectual property rights violations. And "courts may not modify the plain meaning of the words [of an insurance policy] under the guise of 'interpreting' [it]." Wall Rose Mut. Ins. Co. v. Manross, 939 A.2d 958, 962 (Pa. Super. Ct. 2007).

Courts that have considered intellectual property rights exclusions with language similar to Paragraph B of the IP Rights Exclusion have consistently reached the same result. For example, in Vitamin Health, Inc. v. Hartford Casualty Insurance Company, 186 F.3d 712, 720 (E.D. Mich. 2016), the court considered an exclusionary provision which excluded from coverage "any injury or damage alleged in any claim or suit that also alleges an infringement or violation of any intellectual property right . . . regardless of whether this insurance would otherwise apply." The court held that this exclusion "clearly and unambiguously bars coverage in situations where, as here, a claim of false advertising [which was otherwise covered by the policy at issue] is alleged in a suit that *also* alleges patent infringement claims." Id. at 720-721 (emphasis in original).

Likewise, in Ventana Medical Systems, Inc. v. St. Paul Fire & Marine Insurance Company, No. 09-cv-102, 2010 WL 1752509, at *4, 19-22 (D. Ariz. Jan. 13, 2010), the court considered an exclusionary provision that—in addition to excluding from coverage "injury . . . from any actual or alleged infringement" of intellectual property rights—excluded "any other injury . . . alleged in a claim or suit that also alleges any such infringement or violation." While noting that this exclusion was "potentially harsh," the court found it to be unambiguous, explaining that it was clear that the insurer "intend[ed] to exclude from its . . . policy any damages that arise from intellectual property violations *and any damages that arise from any other claims when a claim of intellectual property violation is asserted.*" Id. at *20 (emphasis added).

Attempting to distinguish these cases, TELA Bio relies on Align Technology, Inc. v. Federal Insurance Company, 673 F. Supp. 2d 957, 967-969 (N.D. Cal. 2009), where the court found that an intellectual property rights exclusion was ambiguous. But the IP Rights Exclusion

18

at issue here is far clearer than the language of the exclusion at issue in <u>Align Technology</u>, which provided as follows:

> This insurance does not apply to any actual or alleged bodily injury, property damage, advertising injury or personal injury arising out of, giving rise to or in any way related to any actual or alleged:
>
> - assertion; or
> - infringement or violation;
>
> by any person or organization (including any insured) of any intellectual property law or right, regardless of whether this insurance would otherwise apply to all or part of any such actual or alleged injury or damage in the absence of any such actual or alleged assertion, infringement or violation.

<u>Id.</u> at 969.

This exclusion contains nearly verbatim the language from Paragraph A of the Policy's IP Rights Exclusion. But it lacks the critical language found in Paragraph B—excluding "the entirety of all allegations in any claim or suit, if such claim or suit includes an allegation of or a reference to an infringement or violation of an intellectual property law or right." With that critical language, it is clear the IP Rights Exclusion at issue here excludes an entire suit from coverage if that suit contains any allegation that the insured violated another's intellectual property rights.

In sum, because the LifeCell Suit Complaint alleged that TELA Bio appropriated LifeCell's trade secrets and confidential information—indeed, this was the gravamen of the LifeCell Suit—the IP Rights Exclusion precludes coverage for the suit in its entirety. Accordingly, Federal Insurance had no duty to defend TELA Bio in the LifeCell Suit.

## IV. CONCLUSION

For the reasons set out above, Federal Insurance's Motion to Dismiss for Failure to State a Claim will be granted and this action will be dismissed with prejudice.

An appropriate Order follows.